**COUNCIL OF DEFENSE OF STATE OF NEW MEXICO et al. v. INTERNATIONAL MAGAZINE CO.**

(Circuit Court of Appeals, Eighth Circuit. May 24, 1920.)

No. 5254.

1. Courts ☞101—Preliminary injunction suit not within requirement of hearing by three judges; "suit to restrain enforcement or operation of state statute."

A suit against a state council of defense and its members, to enjoin acts alleged to be outside of and beyond the powers conferred on them by the statute creating such council, *held* not one to restrain the enforcement or operation of a state statute, within the meaning of Judicial Code, § 266 (Comp. St. § 1243), requiring an application for preliminary injunction in such case to be heard and determined by three judges.

2. War ☞4—Action by state council of defense not action by Governor.

That proposed action by a state council of defense was made known to and approved by the Governor, before it was taken, *held* not to render such action that of the Governor in the exercise of special war powers conferred on him by statute.

3. Equity ☞65(3)—Corporation not subject to defense of unclean hands because of acts of stockholder.

A claim that a corporation complainant comes into court with unclean hands cannot be predicated on acts of a stockholder, unconnected with any action by the corporation.

4. Monopolies ☞17(1)—Unlawful interference with interstate trade in magazines.

The action of the state council of defense of New Mexico, not authorized by anything in the statute creating it, in appealing through a paper pub-

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

lished by its authority to newsdealers and citizens of the state not to sell or read magazines published by complainant corporation in New York and sent into the state for sale by newsdealers under contracts, and in otherwise inducing such newsdealers to cancel their contracts and refuse to handle complainant's magazines, *held* an unlawful interference with interstate commerce, in violation of the Sherman Act, not justified on the ground that the majority stockholder of complainant, through newspapers owned or controlled by him, was expressing disloyal and pro-German sentiments, calculated to interfere with successful prosecution of the war; no claim being made that complainant's magazines contained objectionable matter.

Appeal from the District Court of the United States for the District of New Mexico; Colin Neblett, Judge.

Suit in equity by International Magazine Company against the Council of Defense of the State of New Mexico and others. Defendants appeal from an order granting a preliminary injunction. Affirmed.

James M. Hervey, of Roswell, N. M., and A. B. Renehan, of Santa Fé, N. M., for appellants.

Francis C. Wilson, of Santa Fé, N. M., for appellee.

Before CARLAND and STONE, Circuit Judges, and AMIDON, District Judge.

STONE, Circuit Judge. This is an appeal by various individuals, who were the Governor and Attorney General of the state of New Mexico, and members, officials, or agents of the Councils of Defense of the state and of Bernalillo county, from a preliminary order enjoining them from interfering with the sale and distribution in New Mexico of magazines published and sold by appellee, the International Magazine Company. The importance and character of the issues necessitate a full statement of the controversy, which may be gained from the complaint and a portion of the statement of the case by appellants. The complaint is as follows:

"International Magazine Company, a corporation duly organized and existing under the laws of the state of New York, having its principal office and place of business in the city of New York, in said state, and a resident and citizen of the state of New York, brings this bill against the Council of Defense of the State of New Mexico, organized and existing under the laws of the state of New Mexico, Secundino Romero, W. A. Hawkins, C. R. Brice, J. M. Sully, Eufracio Gallegos, Charles Springer, B. C. Hernandez, Eduardo M. Otero, Walter M. Danburg, Guthrie Smith, Alfred Grunsfeld, Max Nordhaus, Jesus Romero, Nestor Montoya, Rafael Garcia, W. C. Oestreich, W. C. Reid, A. B. McMillen, P. G. Redington, L. A. McRae, Felix Baca, H. E. Rogers, the Council of Defense of the County of Bernalillo, W. E. Lindsey, and Harry L. Patton, all of them being residents and citizens of the state of New Mexico.

"(1) And thereupon your orator complains and says that it is, and for some years last past has been, a corporation duly organized, created, and established by and under the laws of the state of New York, for the purpose of carrying on the business of owning, publishing, editing, preparing, and selling magazines, and is now, and has been at all times material hereto, the owner and publisher of certain magazines of general circulation throughout the United States and the state of New Mexico, known to the reading public, and owned, printed, and published by your orator under certain names registered under the trade-mark laws of the United States of America, as follows, to wit: Hearst's, Cosmopolitan, Good Housekeeping, Harper's Bazaar, Motor,

Motor Boating, and Puck—each of which magazines is printed, published, and prepared for sale monthly by your orator in the city and state of New York, and through its general agents in all the large cities of the United States, including Los Angeles, Cal., distributed and sold to local dealers throughout the state of New Mexico, and by them sold and distributed to the trade in said state; and your orator further alleges and shows that prior to the commission of the acts hereinafter complained of your orator enjoyed a large and lucrative sale of said magazines throughout the said state of New Mexico, which was of increasing value to it by virtue of a growing subscription list and an annual increase in sales by newsdealers throughout the state, whereby the right at all times material hereto, and in the future, of unrestricted access to the markets of New Mexico, and the right to sell its product in the ordinary course of trade and business and through the usual channels in said state, in fair and untrammeled competition with products of a similar or of the same character, is of great value to your orator, to wit, of a value far in excess of $3,000, and that the loss and damage, both past and prospective, to your orator, by reason of the acts of the defendants herein complained of, is not less, and in truth and in fact is far in excess of, said amount.

"(2) Your orator further gives your honor to be informed that the defendant the Council of Defense of the State of New Mexico was created by an extraordinary session of the Legislature of the said state of 1917, by an act of the said Legislature approved May 8, 1917, entitled 'An act to provide for the public defense,' the pertinent provisions of which, relating to the creation of the said State Council of Defense, being as follows, to wit:

" 'There is hereby created a council to be known as the Council of Defense of the State of New Mexico, consisting of nine (9) members, to be appointed by the Governor by and with the advice and consent of the Senate, who shall serve during the time of the present war, and for such further time thereafter as the Governor may deem necessary. The Governor shall have power to fill any vacancy that may occur on such council by the death, resignation, or inability to serve of any member thereof, and may remove any member for cause and appoint some person to fill such vacancy.

" 'Said council shall hold its meetings at the city of Santa Fé, or at such other place or places as it may deem necessary, and a majority of the council shall constitute a quorum to do business, and the affirmative vote of a majority of such quorum shall be required and shall be sufficient to adopt or pass any motion or resolution authorizing or directing any act or thing within the power of the council. Any number less than a quorum may meet and adjourn from day to day until a quorum be present. The council may determine the rules of its procedure, and with the approval of the Governor, may make any and all regulations necessary for the carrying out of the provisions of this act.

" 'The council, as soon as it is organized, shall communicate at once with the National Council of Defense, and offer its co-operation and state that it is organized and is ready to receive information and to carry out within the state of New Mexico such plans as will mutually be agreed upon for the defense of the nation, and shall, in every way possible, co-operate with such National Council of Defense. It shall get into communication with defense bodies representing other states and shall co-operate with them as far as may be practicable.

" 'The council, after consultation with the National Council of Defense, shall gather at once through its committees or otherwise, statistics, facts and other information found necessary, and shall arrange them in an orderly and accessible manner. They shall supervise and direct investigations and make recommendations to the Governor and to the Legislature.

" 'The members of the council shall be paid five dollars ($5.00) per day and necessary traveling expenses for the time they are actually engaged in the performance of their duties as members of such council, to be paid out of the state war fund. The council shall cause to be kept an accurate record or journal of its proceedings, and the original thereof shall be filed with the secretary of state at the termination of the term of service of the said council.'

"That pursuant to the provisions of said act the defendants Secundino Romero, W. A. Hawkins, C. R. Brice, J. M. Sully, Eufracio Gallegos, Charles Springer, B. C. Hernandez, and Eduardo M. Otero were duly appointed by the Governor, and their appointments confirmed by the Senate of the state of New Mexico, as members of the said Council of Defense of the State of New Mexico, and said defendants are now, and at all times material hereto were, members of said council; that the defendant Walter M. Danburg is general secretary of said Council of Defense, and defendant Guthrie Smith is, and was at all times material hereto, the publicity agent thereof, and editor of a weekly newspaper known as the 'New Mexico War News,' which was at all times material hereto and now is printed, published, issued, and distributed throughout the state of New Mexico by the said Council of Defense in the manner hereinafter set forth; that the Council of Defense of Bernalillo County is an organization, the members of which are selected by the State Council of Defense and appointed by said W. E. Lindsay, as governor of New Mexico, from residence of Bernalillo county, and organized for the purpose of co-operating with the State Council of Defense in promoting patriotism and the purposes of the government of the United States in the prosecution of the war with the Central Powers; that the defendants Alfred Grunsfeld. Max Nordhaus, Jesus Romero, Nestor Montoya, Rafael Garcia, W. C. Oestreich, W. C. Reid, A. B. McMillen, P. G. Redington, L. A. McRae, Felix Baca, and H. E. Rogers are, and were at all times material hereto, members of said organization appointed by the Governor as aforesaid; that the defendant Washington E. Lindsey is the duly elected and acting Governor of the state of New Mexico, and as such chief executive of said state has, under and by virtue of the said act of New Mexico Legislature, the power of appointment and removal of members of said council, and supervisory and advisory powers over the acts, matters, and things done by said Council of Defense; and the defendant Harry L. Patton is the duly elected and acting Attorney General of said state, and as such head of the legal department of said state.

"(3) And your orator gives your honor further to be informed that certain of the individual defendants, to wit, Secundino Romero, W. A. Hawkins, C. R. Brice, J. M. Sully, Eufracio Gallegos, Charles Springer, B. C. Hernandez, and Eduardo M. Otero, as members of the said Council of Defense in New Mexico, have created an executive committee, composed of the said defendants Charles Springer, B. C. Hernandez, and C. R. Brice, which said executive committee, in the name and by authority of said Council of Defense, directly supervises, controls, edits, publishes, and issues the said weekly paper known as 'New Mexico War News,' which is now, and has been at all times material hereto, circulated free of charge generally throughout the state of New Mexico, and is widely read as the official medium of the said Council of Defense, and as such medium has great weight and authority with the people of New Mexico upon all questions relating to the war and war measures, and affords a ready, convenient, powerful, and effective vehicle and instrument for the dissemination of publicity concerning the war and war measures."

"(4) Your orator further informs your honor that it is informed and believes, and accordingly so alleges the fact to be, that the defendants Secundino Romero, W. A. Hawkins, J. M. Sully, Eufracio Gallegos, Charles Springer, B. C. Hernandez, Eduardo M. Otero, Washington E. Lindsey, Guthrie Smith, Walter M. Danburg, Harry L. Patton, and many other persons whose names are to your orator unknown, combining and confederating together, engaged, and are now engaged, and threaten to continue to engage, in a scheme and an effort to unite all of the newsdealers, county councils of defense, community councils of defense. and social organizations in the state of New Mexico in a movement or combination and confederacy with said defendants to boycott and prevent the sale and distribution of the magazines of your orator throughout the state in any manner whatsoever, and to interfere with, prevent, restrict, and restrain the free access of your orator to the markets of New Mexico for its said magazines, and the sale and distribution of the same through the ordinary, usual, and customary channels employed by it and its competitors in said state, and to utterly destroy its trade, business, and commerce in said .

state, and to prevent it from carrying out and performing its contracts with said newsdealers, and in furtherance of and to achieve the said scheme and purpose the said defendants did the several acts hereinafter stated, either by themselves or their agents, by them thereto fully authorized.

"(5) That the said defendant C. R. Brice had no part in the action of the said defendants named in the preceding paragraph, and had no knowledge of the proposed purpose and intent of the said combination and confederation, until the issue of said New Mexico War News of June 6, 1918, and upon becoming acquainted with the same utterly disclaimed any support of said scheme and purpose, and condemned the same in vigorous terms in a written communication to said defendant Washington E. Lindsey, as Governor of said state, and advising the immediate cessation of the purpose of said combination, condemning the effort as illegal, unlawful, un-American, and wholly unjustifiable; and your orator gives your honor to be informed that, in case the acts of such of the defendants as are members of said Council of Defense of New Mexico should be held to be without authority in law or otherwise, and not binding upon the said Brice as a member thereof, that it is the desire and purpose of your orator to dismiss this proceeding as to the said defendant C. R. Brice.

"(6) On or about June 6, 1918, and thereafter upon dates hereinafter set forth, the said defendants named in the second preceding paragraph, individually and collectively, and as members of said combination and confederation, in furtherance of their general scheme and purpose, announced their purpose and intent as hereinbefore alleged, and caused the same to be printed, published, and circulated in said New Mexico War News in the issue of June 6, 1918, as follows, to wit:

" 'Another Roll of Honor.

Zook's Pharmacy
Weltmer & Burrows
Capital Pharmacy ·
All of Santa Fé

" 'These companies, composed of New Mexicans who assay 100 per cent. in Americanism, have declared that they will not sell any more Hearst publications, either newspapers or magazines, for the period of the war. The July number of the monthly magazines will be the last one to be sold. The July Cosmopolitan has been received, and the July numbers of others are on the way, therefore not subject to cancellation.

" 'Hearst newspapers have been anti-British ever since there have been any Hearst newspapers. When President Wilson asked the Congress to amend the Canal Tolls Act, Hearst made a long series of savage attacks upon the President. He asserted that the President had unconditionally surrendered to Great Britain; that he never had been anything better than a servile tool of the Empire; that he was a traitor to American interests.

" 'What Hearst has said since America entered the war has been anti-British every day, and as openly un-American and pro-German as he dared to be. What he has said has been told in part in these columns, from time to time, and more of it will be related in subsequent issues.

" 'Having prepared the evidence of sufficient strength, the New Mexico Council of Defense made its initial move by asking the newsdealers of Santa Fé to stop the sale of the publications. Their immediate response was most gratifying and the Council will ask every newsdealer in the state to stop the sale of all the publications for the period of the war. This request will go through the county and community councils of defense, but no newsdealers, hearing of the move, need wait until he receives the request from his county or community council.

" 'A placard announcing that no more Hearst publications will be sold during the period of the war will be furnished by the Council of Defense for use by the dealers. The War News will continue to print each week in the honor roll, the names of the dealers as they fall into line. The newspapers published by Hearst are the following:

Atlanta American
Atlanta Georgian
Boston Advertiser
Boston American
Chicago American
Chicago Herald & Examiner
Los Angeles Examiner
New York American
New York Journal
San Francisco Examiner

" 'The Hearst Magazines are as follows:
Hearst's
Cosmopolitan
Good Housekeeping
Harper's Bazar
Motor
Motor Boating
Puck

" 'The Council of Defense calls upon 'every loyal, patriotic citizen of New Mexico not only to quit asking for the Hearst publications at the newsdealers, but to stop taking them on subscription, and to stop reading them; in other words, to say to Herr Wilhelm von Hearst, the Hearst publications and Hearstism in general: Good Night!'

"That thereafter, on, to wit, the 13th day of June, 1918, and in pursuance of the same general scheme and purpose, the said defendants caused to be published and circulated in said New Mexico War News, the following placard and notice:

" 'Hearst's
" 'Newspapers and Magazines
" 'Not Sold Here
" 'For Period of the War

" 'The New Mexico Council of Defense and the County Council of defense of this county have convinced us that Hearst's newspapers have been anti-British, un-American and pro-German since America entered the world war.

| " 'Hearst's Newspapers | Hearst's Magazines |
|---|---|
| Atlanta American | Hearst's |
| Atlanta Georgian | Cosmopolitan |
| Boston Advertiser | Good Housekeeping |
| Boston American | Harper's Bazar |
| Chicago American | Motor |
| Chicago Herald & Examiner | Motor Boating |
| Los Angeles Examiner | Puck |
| New York American | |
| New York Journal | |
| San Francisco Examiner | |

" 'The Council of Defense calls upon every true American New Mexican not only not to ask the newstands for the Hearst publications, but not to receive them on subscription and to quit reading them altogether.

" 'Governor Lindsey and Attorney General Patton approve and indorse this move to rid the state of Hearst publications and Hearstism.'
—and thereafter printed said placard or notice on cardboard or heavy paper, and caused the same to be distributed by their agents throughout the state of New Mexico, to newsdealers who had the magazines of the complainant for sale and distribution under the terms and conditions of written contracts or agreements with your orator, with the request that the said placard be displayed and that the said newsdealers abstain from and refuse to handle, sell, or distribute the said magazines.

"That thereafter, to wit, on the 20th day of June, 1918, and in pursuance of the same general scheme and purpose, the said defendants caused to be

published and circulated in said New Mexico War News, the following article, to wit:

　　　" 'The New Honor Roll.

　　　　Zook's Pharmacy
　　　　Weltmer & Burrows
　　　　Capital Pharmacy
　　　　　　All of Santa Fé
　　　　Post Office News Stand of Clovis·
　　　　F. C. Rolland
　　　　W. E. Warren
　　　　　　Of Alamogordo
　　　　Rio Grande Drug Co. of Taos

" 'There are real Americans who will sell no more Hearst publications for the period of the war. Having been convinced that Hearst has wielded all of his enormous influence in favor of Germany and against Great Britain and the United States, since the United States entered the war, these par patriots have decided it is time to put the offender into the enemy camp and to make substantial reductions in his influence.

" 'The action of the Council of Defense, in declaring war on Hearst publications, is causing some uneasiness in the mind of Kaiser Wilhelm's notorious satellite in America. Howard E. Morton, city editor of the Los Angeles Examiner, came to Santa Fé last Thursday morning and called on Charles Springer, chairman of the executive committee. Mr. Springer told the Hearst emissary that he had seen enough evidence to be convinced that Hearst has been unpatriotic since America entered the war. "However," said Mr. Springer, "you may go and talk with our publicity manager, who has been working on the investigation for some months."

" 'Mr. Morton made the call. At the end of a conference lasting more than two hours, he was informed that the fight would be pressed, so far as the publicity department was concerned. Friday night Mr. Morton had another conference with Mr. Springer. At the close of the conference Mr. Springer said he was still not convinced of Hearst's patriotism; that in spite of Hearst's apparent support of the war at this time, he believed that in the event of a peace conference all the Hearst influences would be wielded against Great Britain in an effort to leave Germany dominant in Europe.'

"That thereafter, to wit, on the 25th day of June, 1918, and in pursuance of the same general scheme and purpose, the said defendants caused to be published and circulated in said New Mexico War News the following article, to wit:

　　　" 'The New Honor Roll.

　　　　Zook's Pharmacy
　　　　Weltmer & Burrows
　　　　Capital Pharmacy
　　　　　　All of Santa Fé
　　　　Post Office News Stand of Clovis
　　　　F. C. Rolland
　　　　W. E. Warren
　　　　　　Of Alamogordo
　　　　Rio Grande Drug Co. of Taos
　　　　Matson's Book Store
　　　　Strong's Book Store
　　　　Sturges Cigar Stand
　　　　Griggs' Pharmacy
　　　　Highland Pharmacy
　　　　George Bryan, local agent for Los Angeles Examiner
　　　　　　All of Albuquerque
　　　　R. E. Dick
　　　　Harry Braden
　　　　Milton Smith
　　　　　　Of Carlsbad

" 'Additions are being made to the new honor roll as fast as information is placed before the loyal men who sell newspapers in New Mexico. The six Albuquerque dealers are reported in the Albuquerque Journal as having declared they will handle no more of the Hearst publications during the period of the war and placards will be furnished by George C. Taylor, who received a supply when he was at headquarters recently.'

"(7) And your orator further informs you honor that in pursuance and furtherance of the same general scheme and purpose, the said defendants individually and collectively, so combining and confederating together, by force of the overwhelming influence of the said Council of Defense, of New Mexico and the prominence of the members thereof and the great weight attached to the leadership of said State Council, and the prestige of the said Washington E. Lindsey as Governor of said state, and of said Harry L. Patton, as Attorney General of said state, and by inducing them to believe that if they did not join in with the movement to exclude the said magazines from New Mexico they would be branded before the people of New Mexico as unpatriotic and disloyal, prevailed upon and persuaded by said coercive measures and means the said defendants Alfred Grunsfeld, Max Nordhaus, Jesus Romero, Nestor Montoya, Rafael Garcia, W. C. Oestreich, W. C. Reid, A. B. McMillen, P. G. Redington, L. A. McRae, Felix Baca, and H. F. Rogers, as members of the County Council of Defense of Bernalillo County, to pass a resolution in the name of said County Council of Defense as follows, to wit:

" 'Be it resolved, by the Bernalillo County Council of Defense, at a meeting held June 25, 1918, that the council heartily indorses the action of the New Mexico State Council of Defense in condemning as unpatriotic the attitude and sentiments of William Randolph Hearst; and

" 'Be it further resolved that the people of Bernalillo county are urged to discontinue their patronage of the Hearst publications and that news dealers are requested to cease selling these publications from their news stands'

—and through the medium of certain of said defendants, who were then and are now members of two social organizations of great influence in the city of Albuquerque, known as the Rotary Club and the Kiwanis Club, prevailed upon and persuaded said clubs to pass resolutions, of which that passed by said Rotary Club reads as follows:

" 'Whereas, the New Mexico State Council of Defense has requested the newsdealers of New Mexico to stop the sale of the Hearst publications for the period of the war, and every loyal citizen of New Mexico not only to quit asking for the publications at the newsdealers, but to stop taking them on subscription, and to stop reading them:

" 'Now, therefore, be it resolved by the Albuquerque Rotary Club that the action of the New Mexco State Council of Defense be and is hereby heartily indorsed, and that the club will assist and co-operate with the State Defense Council in making its request effective'

—and in many other particulars, as your orator is informed and believes, and accordingly states the facts so to be, combined and confederated with the defendants named in paragraph 4 to bring about said common scheme and purpose.

"(8) And your orator further informs your honor that on or about June 6, 1918, the said defendants, through their publicity agent and editor, the said defendant Guthrie Smith, maliciously and with the intent of injuring the business of your orator in the country at large, and in furtherance and in pursuance of the common scheme and purpose of said combination and confederation, and to further coerce the people and the newsdealers of the state of New Mexico by wide publicity into the belief that the measures and means employed by said defendants were proper and appropriate and should have their co-operation and assistance, and to attempt to gain widespread notoriety for the action of said defendants, and to obtain the support of powerful influential papers throughout the United States, and to influence public opinion within the state against your orator, and to obtain the co-operation and support of other State Councils of Defense, sent telegrams to large and influential newspapers throughout the country (amongst others, the Los Angeles Times and the New York Tribune), announcing the scheme and purpose of

said combination, which said telegrams were of uniform context as follows, to wit:

" 'All newsdealers of the capital city of New Mexico, patriotically complying with the request of the State Council of Defense, agreed to-day to stop selling all Hearst newspapers and magazines for the period of the war, holding these publications to be so anti-British, un-American and pro-German as to constitute a menace to the Allied cause.

" 'The council, through the county and community councils of defense, will urge every newsdealer in New Mexico to follow the same course.'

"(9) That certain of the newsdealers in New Mexico, to wit, Zook's Pharmacy, a corporation, and Weltmer-Burrows Drug Company, Incorporated, both doing business in Santa Fé, New Mexico, Rio Grande Drug Company, doing business at Taos, New Mexico, F. C. Rolland and W. K. Warren, of Alamogordo, Sturges Hotel Company, a corporation, Strong's Book Store, a corporation, O. A. Matson and H. Emory Davis, partners doing business under the firm name and style of O. A. Matson & Co., E. H. Briggs, doing business under the name and style of Briggs' Pharmacy, L. A. Rice, doing business under the name and style of Highland Pharmacy, all of Albuquerque, New Mexico, and R. M. Bishop, of Clovis, New Mexico, all newsdealers and sellers and distributors of the said magazines of your orator, and under contract with it for said purpose, in fear of being considered disloyal and un-American, and of not assaying '100 per cent. Americanism,' and of losing the patronage of patriotic Americans if they did not comply with the request and the demands of the said defendants, and without personal knowledge of any alleged disloyalty of the said magazines of your orator, permitted themselves to be intimidated, coerced, and were intimidated and coerced by said defendants, and the matters and things done, said, printed, and published by said defendants, into acting in concert with the said defendants in their scheme and purpose, and, so intimidated and coerced, the said newsdealers, in order to aid the defendants in their purpose of bringing about the entire exclusion of the said magazines from New Mexico, and of closing the said state to the complainant as a territory within which it might compete with other owners of similar magazines through the regular, usual, and customary channels of trade without restraint and restricton, canceled their contracts with your orator for the said magazines, and notified the agent of your orator in Los Angeles that they would no longer handle, sell, and distribute such magazines in New Mexico, which said condition has ever since and does now continue, and in furtherance of said common purpose and scheme placed in their show or display windows, as your orator is informed and believes, and therefore states the fact to be, the placard printed and furnished to them by the said defendants, as set forth above, and in words and figures as it appears hereinbefore; and upon information and belief your orator informs your honor that many other newsdealers and subscribers, too numerous to set forth herein, throughout the state of New Mexico, as a result of said propaganda, intimidation, and coercion of the said defendants, have canceled their contracts with your orator, and have refused and do now refuse to receive said magazines, or to sell and distribute them to their patrons and customers.

"(10) That all of the said acts, matters, and things done by said defendants, their agents and servants, individually and collectively, and as members of said combination and confederation, and by such other persons, whose names are now unknown to your orator, who may be associated with defendants in said scheme and purpose, were done with intent, as your orator is informed and believes, and thus states the facts to be, willfully, wantonly, and maliciously to injure and have injured your orator in its property and business, and to render unsalable its magazines in the state of New Mexico, and to prevent, restrict, and restrain the introduction of said magazines into the state of New Mexico from other states, and especially the state of New York.

"(11) That all of the said acts, matters, and things done by said defendants, their agents and servants, individually and collectively, and as members of said combination and confederation, and by such other persons, whose names are now unknown to your orator, who may be associated with the defendants, and the said general scheme and purpose of boycotting the said magazines of your orator and the blacklisting of the same, and of preventing your ora-

tor from having that free access to the markets of New Mexico for the sale of its magazines assured to it by the laws of the state of New Mexico and the United States of America, are unlawful, contrary to, and in violation of section 1685 of the codification of 1915 of the laws of New Mexico, which in words is, as follows, to wit:

"'Every contract or combination between individuals, associations or corporations, having for its object or which shall operate to restrict trade or commerce or control the quantity, price or exchange of any article of manufacture or product of the soil or mine, is hereby declared to be illegal.

"'Every person, whether as individual or agent or officer or stockholder of any corporation or association who shall make any such contract or engage in any such combination, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding one thousand dollars nor less than one hundred dollars, and by imprisonment at hard labor not exceeding one year, or until such fine has been paid'
—and the provisions of the act of Congress approved July 2, 1890 (26 Stat. at Large, 209, c. 647), entitled 'An act to protect trade and commerce against unlawful restraints and monopolies.'

"(12) And your orator avers and further informs your honor that the said acts, matters, and things alleged to have been done by such of the defendants who are and were at all times material hereto members of the defendant the Council of Defense of the State of New Mexico, in the name and by authority of said Council of Defense, were done without power or authority to act in their behalf under the law creating said Council of Defense, and the use of the name of said Council of Defense was without legal right, justification, or valid excuse, and as your orator is informed and believes, and so states the facts to be, for the sole purpose of promoting and furthering said unlawful and malicious scheme to destroy the business and property of your orator.

"(13) Your orator further avers and informs your honor that the acts of said defendants, as hereinbefore set forth, are un-American, opposed to the policy of government of the United States of America in the present war with the Central Powers, subversive of law. and order, and in general opposed to public policy, in that the said defendants, without judicial power or authority and under the cloak of patriotic organizations and patriotic purposes, have constituted themselves judges and prosecutors, and, having convicted your orator without a hearing, now seek to conduct a journalistic lynching with your orator as the victim, by means of a boycott and blacklisting of its publications, and in such wise to abridge and to restrain its right guaranteed to it by the Constitution of the United States, and the Constitution of the state of New Mexico, as contained in section 17, article II, of the Constitution of said state, whereby it is free to publish within said state its sentiments on all subjects, being responsible only for the abuse of that right, and the said defendants seek by their said unlawful, oppressive, and coercive acts to drive your orator's publications from New Mexico, and by this means to dictate to the people of New Mexico and to control what they should or should not read.

"(14) Your orator further alleges and shows unto your honor that it is, and at the time of the commission of the acts hereinabove complained of was, the owner and proprietor, by purchase from or employment of the author or authors, of each and every article or picture, in any of said above-named magazines, save as may have been otherwise indicated in connection with the publication of a particular article or picture; that your orator, as such successor to said authors and as the proprietor and owner desiring to secure a copyright upon the aforesaid magazines, so published by it throughout the period of the commission of the acts herein complained of, and upon the various articles, stories, and pictures therein contained in accordance with the statutes of the United States in such case made and provided, published each of said magazines, and the articles, stories, and pictures therein contained, in each of which said magazines your orator caused to be printed and published in each separate number thereof, upon its title-page, the notice of copyright in the form and manner required by law, to wit, 'Copyright, 1918, International Magazine Company;' that after the publication of said magazines with notice

of copyright therein contained as hereinabove alleged, your orator promptly in each instance duly deposited in the mail within the United States, to wit, at the city of New York, in the state of New York, two complete copies of the best edition of each issue of said magazines, addressed to the Register of Copyrights, Washington, District of Columbia, accompanied in each instance by a claim of copyright. Your orator further avers and says that each of such copyrighted periodicals and the articles, stories and pictures contained therein were printed from type set within the limits of the United States, or from plates made within the limits of the United States from type set therein, and that the printing of the text and the binding of the aforesaid magazines, and each and every issue thereof, was and is performed within the limits of the United States; and your orator avers that it has done all acts and complied with all legal requirements necessary to establish its right to the aforesaid copyrights, under the statutes of the United States in such case made and provided. Your orator further shows that it has caused to be printed and inserted in the several copies of each volume or issue of each of said magazines, on the title-page thereof, the word 'Copyright,' together with the year said copyright was acquired, and the words 'International Magazine Company,' as required by law.

"Your orator further avers and shows unto your honor that the course and practice hereinabove set forth, with reference to the publication of notice of copyright, the depositing in the mail of copies of said copyrighted magazines, and the place of the printing, publishing, and binding thereof, and the doing of each and every other matter and thing necessary and required by it to be done, in order to entitle it to a copyright of the aforesaid magazines, and the articles, stories, and pictures therein contained, are pursued by it with reference to the publication of each and every issue of all of the above-named and described magazines, so that your orator acquires and becomes the proprietor of a copyright as to each of said magazines and every issue thereof.

"Your orator further represents and shows unto your honor that, under and by virtue of the provisions of the copyright laws of the United States, it is guaranteed an unrestricted right to vend its copyrighted publications throughout the United States and in each and every state thereof, and that this court is given jurisdiction under the provisions of said copyright law, upon bill in equity filed by any party aggrieved, to grant injunctions to prevent and restrain the violation of any right secured by said law.

"Your orator further avers and says that, by reason of the wrongful, willful, oppressive, and malicious acts of the defendants hereinabove complained of, it has been, and is now, and in the future will be, denied the right, guaranteed to it by virtue of said laws, to vend its copyrighted publications in the state of New Mexico, and will be continuously so prevented from the exercise and enjoyment of its said right guaranteed to it under said act, to its irreparable damage, unless this court exercise the power and authority granted in said act to restrain and enjoin the said defendants.

"And your orator further avers and informs your honor that because of the nature of the illegal acts of the defendants, and the methods employed by them to accomplish their scheme and purpose, and the great number of persons who have combined with the said defendants in the said illegal, unlawful, and oppressive combination and confederation, your orator has suffered and is now suffering irreparable damage and mischief, and has no adequate remedy at law, and further that any attempt to obtain such remedy would involve a multiplicity of suits. In consideration whereof, and forasmuch as your orator can only have adequate relief in the premises in a court of equity, where matters of this nature are properly cognizable and remediable, and to the end that such relief may be granted, your orator prays the court:

"1. To grant it a writ of injunction, enjoining and restraining the said defendants Council of Defense of the State of New Mexico, Secundino Romero, W. A. Hawkins, C. R. Brice, J. M. Sully, Eufracio Gallegos, Charles Springer, B. C. Hernandez, Eduardo M. Otero, Walter M. Danburg, Guthrie Smith, W. E. Lindsey, Harry L. Patton, the Council of Defense of the County of Bernalillo, Alfred Grunsfeld, Max Nordhaus, Jesus Romero, Nestor Montoya, Rafael Garcia, W. C. Oestreich, W. C. Reid, A. B. McMillen, P. G. Redington, L. A. McRae, Felix Baca, H. E. Rogers, their attorneys, agents, and

representatives, individually and collectively, from boycotting and black-listing the complainant and its magazines, from restraining the complainant from selling and distributing its magazines to the newsdealers within the state of New Mexico, and to its subscribers within said state, and restricting the business and commerce of the complainant within said state, from restraining the complainant from shipping its magazines into the state of New Mexico from other states, from acting in the name of the Council of Defense of the State of New Mexico, or the County Council of Defense of Bernalillo County, in furtherance of the scheme and purpose of defendants to boycott and blacklist the complainant and its magazines in the state of New Mexico, from printing and circulating placards in the state of New Mexico in furtherance of said boycott, or using any other methods whereby the property of your complainant, or its business, or the interests of those dealing with it, might be damnified or injured, until the further order of the court.

"2. For such other and further relief as may be properly granted you complainant in a court of equity, including its costs and expenses in this behalf most wrongfully sustained."

A portion of the statement of the case by appellants, with immaterial alterations, is as follows:

The defendant Patton made return to the rule on August 8th, admitting his official position of Attorney General; disclaiming knowledge whether the complainant is owner and publisher of the magazines named; denying that damage to the extent of $3,000 has been done to the complainant; admitting the allegations of paragraph 2 of the bill; admitting the personnel of the State Council of Defense and of its executive committee; denying knowledge whether the said executive committee supervised, etc., the War News, or whether that journal is generally circulated in New Mexico; denying the allegations of the fourth paragraph of the bill, generally and specifically; denying knowledge of the matters alleged in paragraph 5 of the bill; denying that on or about June 6, 1918, or at any other time, he either individually or in connection with any other person entered into any combination or conspiracy, or that in furtherance of any combination, scheme or purpose he caused such announcement to be published in the War News of June 6, 1918; denies that he had any knowledge of or connection with the said publication, and denies that the publication of the said article was in furtherance of any scheme or combination, etc.; makes like denials and allegations with reference to the War News items of June 6, 13, and 20, 1918; denies that he individually or in connection with any other person or persons induced, led, or persuaded by any influence or means whatsoever the Bernalillo County Council of Defense and its members to pass the resolution set forth; and makes like denials with reference to the resolutions of the Rotary Club and the Kiwanis Club. He denies that he was connected with the passage of the said resolution by said clubs, if they were passed, and that his influence as Attorney General influenced the passage of such resolutions. He denies knowledge of the allegations of the eighth paragraph of the bill, and says that if Guthrie Smith sent such telegrams he was not acting in any way for or under any authority from "this defendant." He denies that the sending of said telegrams was in pursuance of any scheme, purpose, combination, or federation to coerce the people and newsdealers, etc., and denies any connection with the sending of such telegrams. He denies that the newsdealers named, for fear of being

267 F.—26

considered disloyal, etc., were intimidated, coerced, or influenced by him to refuse to handle, sell, or distribute the plaintiff's magazines. He denies all intimidation or coercion on his part. He denies that he in any way tried to injure or has injured the property and business of the plaintiff in New Mexico, or rendered unsalable its magazines, or restrained their introduction into this state. He denies that he has done any act individually or in connection with others as a general scheme, to boycott the plaintiff's magazines, etc. He neither admits nor denies the allegations of the twelfth paragraph of the bill, because he has not been at any time and is not now a member of the Council of Defense of the State of New Mexico, nor has he had any connection with such organization. He denies all the material allegations of paragraph 13 of the bill. He denies that he has done, and avers that he will not do, any act which in any way will deny to the plaintiff any right granted to it by virtue of the laws of the United States of America, giving it the right to vend its copyrighted publications in the state of New Mexico. He denies that any of his acts have been for the purpose of forming any unlawful oppressing combination or federation, or that the plaintiff has suffered or is now suffering any damage or mischief whatsoever by any act of his.

Further answering, he alleges: That he has in no wise acted against the plaintiff to its damage or detriment; that his approval as chief law officer of the state of any acts of the State Council of Defense or other defendants, as mentioned in the bill, in no wise referred to or concerned the plaintiff or any of its magazines, but that he intended to approve and did approve the condemnation of the Hearst newspapers, induced thereto by reading extracts from editorials and articles appearing in said newspapers, some of which extracts were as follows, to wit:

"If this country is going to be plunged into war, we do not want a schoolmaster in the White House, but a soldier."

"We do not want a theoretical man like Wilson, but a practical man like Roosevelt, for the President is the commander in chief of our military forces."

"If we are going to make war with Germany, we want a commander in chief who knows his business, and not a vacillating incompetent, who doesn't know either his business or his own mind."

"If we are compelled to mingle in this conflict of European powers, this newspaper desires to declare right now that the one man it will support for the President under such circumstances is Theodore Roosevelt."

"But this newspaper sincerely hopes that this country will not be projected into the European turmoil, and that Mr. Wilson will realize the folly of such a course."

"We must say that we think Congress should go slow in this matter of spending our money in such large sums for ALLIED preparedness."

"We have AMERICAN preparedness to pay for. * * * "

"Neither do we think that many Americans feel that we should pay the war cost of these nations in ADDITION TO OUR OWN—America First."

"The painful truth is that we are being practically used as a mere reinforcement of England's warfare and England's aggrandizement."

"It is plain enough that the bond issue is not being eagerly taken to say the least. The banks have gone to their limit with commendable alacrity, but the people are not buying bonds. The government will doubtless eventually dispose of the two billion issue. But who can say as much for the next issue?"

"* * * All the Allies are begging us for cash. England wants money— in heaps at 3½ per cent., while she pays her own people 5 per cent., and

demands 5 per cent. for the money she lends France, Italy, Russia, Canada, and Australia."

"The best peace for all concerned is a peace without victory."

"Further service in the war should be a matter of choice for Americans. * * * "

"These papers have said consistently, and will continue to maintain, that the American soldiers who go to France should go as volunteers, and not as conscripted men sent by the will of government."

"It is neither necessary nor right that the flower of our young American manhood should be sent as a sacrifice offering to the Red Moloch of slaughter, while England has men enough to fight her own battles for many months ahead."

He avers that the reading of such articles, together with other extracts of similar import, convinced him that the policy and sentiment of said newspapers were un-American and unpatriotic, and therefore he condemned, and gave public approval to the condemnation by others of the said daily newspapers. He prays that as to him the said bill may be dismissed and that he recover his costs.

The County Council of Defense of Bernalillo County seems not to have appeared or answered.

The Council of Defense of the State of New Mexico and the members and officers thereof impleaded made return to the rule jointly, except Harry L. Patton, Attorney General, who made separate return. The joint return of the State Council and its members denied information of the corporate character of the plaintiff, its ownership and publication of the magazines mentioned, and of their registration under the copyright laws, but averred that they are owned and dominated by William Randolph Hearst. They denied large and lucrative sales of said magazines in New Mexico, and their increasing value, and especially the jurisdictional amount of $3,000. They denied injury, loss, or damage, past or prospective, in the sum of $3,000, or any other sum, and if in fact the plaintiff has suffered any loss or damage it was less than $500. They deny the creation by the State Council of an executive committee, but assert the appointment of such committee by the Governor under resolution of the State Council.

They deny the allegations of paragraph 4 of the bill, substantially, that they were engaged in a confederation and scheme to unite all newsdealers, county councils of defense, community councils of defense, and social organizations to boycott and prevent the sale and distribution of the plaintiff's magazines, and to interfere with, restrict, etc., the plaintiff's free access to the New Mexico markets for its publications, and destroy its trade and commerce, and to prevent the performance of its contracts with newsdealers, and in furtherance of said scheme or acts alleged.

They deny the materiality of paragraph 5 of the bill.

They admit that the said executive committee, by the approval of the Governor, caused to be published the articles in the War News set forth in paragraph 6 of the bill, and deny all else in said paragraph. They say that none of the placards set forth in said paragraph were ever allowed to be circulated by the committee, but that the committee authorized and published a placard, advising the newsdealers through the War News that such placards could be obtained upon

request, and that such authorized placard is the same as the one set forth in the said paragraph, omitting the words in the first line, "and the County Council of Defense of this county." They aver that no placards were given out, except upon request.

They admit the adoption by the County Council of Defense of Bernalillo County of the resolution stated in the seventh paragraph, and the adoption by the Rotary Club and the Kiwanis Club of the resolution set out in said paragraph, denying all other allegations therein. They admit the sending of the telegram mentioned in the eighth paragraph, denying all else therein, and expressly that the said Guthrie Smith acted for or on behalf of any of the other defendants, but that said telegram was sent by him as correspondent of several large newspapers outside of New Mexico which he represented.

They deny information that newsdealers canceled contracts or notified plaintiff's agent that they would no longer handle said magazines, and deny that such condition has since continued, averring that the newsdealers' action was not caused by fear of being considered disloyal, or un-American, or of losing patronage. They deny that the newsdealers acted without personal knowledge of disloyalty of any of the said magazines, or that they were coerced or intimidated by the defendants, or by any of the matters and things done, printed, or published by them or under their authority, or that the newsdealers acted in concert with any scheme of these defendants. They deny that they, the defendants, in any manner intimidated or coerced, or undertook to intimidate or coerce, newsdealers to assist in the exclusion of the magazines. They deny knowledge of the display of the said placard by the newsdealers. The deny that they caused them to obtain and display such placards other than by the publications in the War News.

They deny that their alleged acts were done to injure or did injure the plaintiff in its property and business, and to prevent, restrict, and restrain the introduction of said magazines into this state, as alleged in the tenth paragraph of the bill.

They deny that their alleged acts were in violation of section 1685 of the New Mexico codification of 1915, and of the act of Congress approved July 2, 1890 (Comp. St. §§ 8820–8823, 8827–8830), to wit, "An act to protect trade and commerce against any unlawful restraints and monopolies," as alleged in the eleventh paragraph of the bill. They deny that their said alleged acts were done without authority under the law creating said Council of Defense and that the use of the name of the counsel was without legal right, justification, or valid excuse, or for the purpose of promoting the alleged malicious scheme to destroy the plaintiff's property, as stated in the twelfth paragraph of the bill.

They deny that their said alleged acts are un-American, or opposed to the policy of the government in the present war, subversive of law and order, or in general opposed to public policy, or that, without judicial power or under the cloak of patriotic organizations and purposes, they have constituted themselves judges and prosecutors, and convicted the plaintiff without a hearing, in restraint and abridgment

of the plaintiff's rights under the Constitution of the United States and the Constitution of New Mexico (section 17, art. 2), concerning the freedom of the press, as alleged in the thirteenth paragraph of the bill.

They deny that the plaintiff has been deprived of any right granted to it to vend its copyrighted publications, or that it will be continuously prevented from the enjoyment of any right to which it was entitled under said act.

They deny that any such right by any wrongful, willful, oppressive, or malicious acts of these defendants has been interfered with or denied, or that the plaintiff has suffered or is suffering irreparable damage or mischief by reason of any acts of the defendants, or any methods employed by them, or by reason of any combination or federation, as alleged in the fourteenth paragraph of the bill. They deny all other allegations of said paragraph.

Affirmatively, these defendants assert, upon information and belief, that the plaintiff is owned and controlled by William R. Hearst, who dominates the policy of the plaintiff corporation and its publications; that the State Council of Defense was instructed by circulars and bulletins from the National Council of Defense to investigate and keep close watch upon all newspapers and publications which were pro-German prior to our entrance into the war and suspected of disloyalty since then; that they investigated the publications of said Hearst, his magazines and newspapers, and found that said publications, through their editorials, articles, and general policy, were exerting a dangerous influence upon the people of this state, tending to undermine the morale of the people in their support of the war, and to hamper the State Council in the stimulation of loyalty, obstructing the State Council in the co-ordination and organization of the state's resources for the war and defense, and particularly the efforts of the State Council in the promotion of Liberty Loans; that said publications were strongly pro-German anterior to the war and have since made frequent attacks upon our Allies, particularly England and Japan, and have advocated policies approved and formerly advocated by the German government and the so-called Central Powers; that as a result of the said investigation the said executive committee requested the newsdealers of the state of New Mexico not to handle any of the so-called Hearst publications, its said request being previously discussed with the Governor and by him authorized and approved, and that the request was published in the War News; that their action was official under the laws of New Mexico and acts of Congress designed to protect the country, stimulate loyalty, organize the country's resources for our common defense and welfare, and was not in any way actuated by a desire to injure Hearst, his associates, or the plaintiff; that they refer to the affidavits of the Governor of New Mexico and of Charles Springer, chairman of the executive committee, attached to the answer or return, setting forth the information upon which these defendants acted, and showing the policy of the Hearst publications and their reputation as given by other newspapers, periodicals, institutions, clubs, organizations, and individuals; that at the time said

action was taken, and prior thereto, the Hearst publications, by attacks upon the administration, its conduct of the war, the President of the United States, members of his cabinet, our Allies, and the advocacy of German policies, exerted a dangerous influence upon the people of this state, and the said executive committee and the Governor considered it their duty, and still consider it their duty, to advise and request the people of this state not to encourage the circulation of such publications, which would tend to aid and comfort our enemies, and strengthen and upbuild the Hearst institutions, and contribute to the success of Hearst in his pro-German and anti-Ally propaganda; that attached newspaper articles and letters, statements by Hearst managers, in writing, show that the plaintiff has suffered no material damage by the action of the State Council complained of, and that no substantial damage is likely to ensue; that they have at no time ordered or demanded the newsdealers or individuals that they cease to handle, read, or sell the so-called Hearst publications, and have used no threats, coercion, or intimidation whatever, but have simply made request, leaving decision to the individual will of each dealer and subscriber. They attach affidavits of a great number of said dealers, showing that they have acted entirely of their own will, and without fear instilled by any source; that the defendants' acts are valid exercise of the state's police powers; that what they have done is within the protection of the freedom of speech and freedom of the press clauses of the New Mexico and federal Constitutions; that the plaintiff has an adequate remedy at law; that the suit is in effect one against this state, and therefore beyond the court's jurisdiction; that their acts were done in the reasonable exercise of discretion under state and national laws.

The excerpts from newspapers and other publications and the other documentary evidence attached to the return are too extensive to be condensed in this statement, but are set out at large in the return to the rule and its supporting affidavits.

They made a supplemental return to the supplemental motion for a return to the injunction, admitting the publication in the War News of July 26, 1918, of the statement:

"No ordinance or legislative act is needed in New Mexico. The newsdealers and the individuals, acting as patriotic citizens defending America and the Allied cause, have power enough to drive Hearst and Hearstism from New Mexico. And they are exercising that power!"

—but deny that it indicated a malicious or intentional injury and a furtherance of the scheme mentioned in the bill, but claim that the article is proper newspaper comment under the freedom of speech and freedom of the press clauses of state and national Constitutions. They admit the publication of the "Herr Hearst" article in the same issue, and aver that it is a true statement, denying that it is an indication of malicious and intentional injury to the plaintiff, and in furtherance of the alleged scheme, and further allege that it is proper newspaper comment under the said Constitutions. They deny knowledge of the article quoted from the State Record of August 2, 1918, and deny its materiality. They say that they are in no wise respon-

sible for the said article. They aver that Guthrie Smith has no connection with the State Record. They deny that the quotation from the State Record is for the purpose of creating further prejudice against the plaintiff.

They deny the allegations of the fourth paragraph of the said supplemental motion, with the exception that they believe their legal position to be sound and uncontrovertible.

They admit that the statement quoted from the State Record of August 2, 1918, appeared therein, but deny responsibility therefor.

It was urged on the hearing that the court, under section 266 of the Judicial Code (Comp. St. § 1243), was without power to grant a preliminary injunction. A preliminary injunction was granted, restraining and enjoining the defendants, and each of them, and their representatives, in furtherance of the scheme and purpose of the said combination, from boycotting and blacklisting the plaintiff and its magazines, from attempting to restrain or restraining the plaintiff from selling and distributing its magazines to newsdealers and subscribers, and from attempting to restrain or restraining the business and commerce of the complainant within the said state, from attempting to restrain or restraining the complainant from shipping its magazines into the state of New Mexico from other states, from acting in the name or using the name of the State Council of Defense or the Bernalillo County Council of Defense in furtherance of the scheme and purpose of the defendants to boycott the complainant and its magazines, from printing and circulating placards in the state of New Mexico in furtherance of said scheme and purpose, or using any other methods in furtherance of said scheme and purpose, whereby the property of said complainant or its business, or the interest of those dealing with it, might be damnified or injured pending the final hearing herein, and until the further order of the court.

The preliminary injunction, before it was signed, was objected to on many grounds, among them one challenging the jurisdiction of a single judge to grant a preliminary injunction, in view of section 266 of the Judicial Code. The objections to the order for a preliminary injunction were overruled, save a modification of the language "restraining and enjoining them, individually and collectively," so that it finally read "restraining them, and each of them, in furtherance of said scheme and purpose of said combination, from boycotting," etc. Exception was allowed to the ruling.

An appeal was prayed with due formality and allowed to this court. It was agreed and ordered that the trial of the case on the merits should await decision on the appeal.

[1] The issues presented in this court are briefly as follows: (a) Whether the constitutionality of state statutes is involved, thus necessitating a hearing of the application for this preliminary order by three judges; (b) whether the complainant comes with clean hands into a court of equity; (c) whether state statutes creating the Council of Defense and granting war emergency powers to the Governor apply to this controversy, and, if so, whether they protect the defendants in their action; (d) whether the freedom of speech and publica-

tion provisions of the national and state Constitutions protect defendants in their actions; (e) whether, if none of the above propositions is held to be present, so as to bar the complaint, defendants have been guilty either of violating the state statute against unlawful combinations, or the Sherman Act, have been guilty of a common-law conspiracy, have violated complainant's rights under the copyright law, or have violated its state and federal constitutional rights of free speech and publication.

The first issue arises in this wise: The State Council of Defense was created by the Legislature of New Mexico, and its powers and duties defined in the following act (Laws Ex. Sess. 1917, c. 5, § 6):

"There is hereby created a council to be known as the Council of Defense of the State of New Mexico, consisting of nine (9) members, to be appointed by the Governor, by and with the advice and consent of the Senate, who shall serve during the time of the present war, and for such further time thereafter as the Governor may deem necessary. The Governor shall have power to fill any vacancy that may occur on said council by the death, resignation, or inability to serve of any member thereof, and may remove any member for cause and appoint some person to fill such vacancy.

"Said council shall hold its meetings at the city of Santa Fé, or at such other place or places as it may deem necessary, and a majority of the council shall constitute a quorum to do business, and the affirmative vote of the majority of such quorum shall be required and shall be sufficient to adopt or pass any motion or resolution authorizing or directing any act or thing within the power of the council. Any number less than a quorum may meet and adjourn from day to day until a quorum be present. The council may determine the rules of its procedure, and, with the approval of the Governor, may make any and all regulations necessary for the carrying out of the provisions of this act.

"The council, as soon as it is organized, shall communicate at once with the National Council of Defense, and offer its co-operation and state that it is organized and is ready to receive information and to carry out within the state of New Mexico such plans as will be mutually agreed upon for the defense of the nation, and shall, in every way possible, co-operate with such National Council of Defense. It shall get into communication with defense bodies representing other states and shall co-operate with them as far as may be practicable.

"The council, after consultation with the National Council of Defense, shall gather at once through its committees or otherwise, statistics, facts and other information found necessary, and shall arrange them in an orderly and accessible manner. They shall supervise and direct investigations and make recommendations to the Governor and to the Legislature.

"The members of the council shall be paid five dollars ($5.00) per day and necessary traveling expenses for the time they are actually engaged in the performance of their duties as members of such council, to be paid out of the state war fund. The council shall cause to be kept an accurate record or journal of its proceedings, and the original thereof shall be filed with the secretary of state at the termination of the term of service of the said council."

[2] The same session enacted a law (Laws Ex. Sess. 1917, c. 3) placing certain war emergency powers in the Governor, as follows:

"Section 1. The Governor is directed to render to the government of the United States in the present crisis any assistance within the power of the state, and he is authorized, either to that end, or for the purpose of providing for the public health, safety and welfare, to organize and employ any and all resources within the state, whether of men, property, or instrumentalities, and for any of these purposes to exercise any and all power which in his judgment may be convenient or necessary.

"Sec. 2. It shall be the duty of every public official in the state to furnish to the Governor such information and assistance as he may require in the execution of the power conferred by this act."

The appellants claim little in their brief and argument under the powers granted through the act creating the council. They are obviously correct in this position, for the action here involved, taken by the members of the council, is beyond the gathering and arrangement of statistics, facts, and other information, the supervision and direction of investigations, and the making of recommendations to the Governor and Legislature, which is all the council is empowered to do under that act. Appellants claim the protection of the broader act granting power to the Governor. This they do upon the theory, as stated in the printed argument, that—

"The proposed action of the State Council of Defense in warning the public against the Hearst publications and in endeavoring to discourage their publication, was made known to him [the Governor] before it was taken, and that he sanctioned and approved the same. We deem this to be tantamount to ordering it, within the terms of the provisions of the foregoing act. That act empowers the Governor to provide for the common defense, safety, and welfare of the people of the state. In other words, the Legislature has conferred, for the period of the war at least, upon the Governor the authority and the right to exercise the police powers of the state, and our contention is that the action of the State Council of Defense, authorized and directed by the Governor under this act, is justified by the police power of the state, and is a legal prerogative."

Appellee challenges this claim that the council was acting under the authority and direction of the Governor and as his instrument, under the powers conferred upon him by the above act. We think this challenge well grounded. While what the council did was with the knowledge and approval of the Governor, it is clear that it was acting upon its own initiative and in no sense as the instrument of the Governor in the exercise of the powers granted to him. As the appellee confines itself to claiming that the members of the council acted outside of and beyond the powers and duties contained in the statute creating it, and does not question the validity of that law, there is no constitutional question of the character requiring a three judge court, under section 266 of the Judicial Code.

[3] The issue that the complainant comes with unclean hands is not well taken. It is clear that the ownership of the magazines here involved was in the International Magazine Company, a corporation. In the absence of statutory provision, the corporation cannot be answerable for the action of a stockholder unconnected with the action of the corporation. They are separate entities in this respect, and each is answerable for his or its own acts, and for such alone. The alleged reprehensible attitude and conduct of Hearst was in no way reflected in any publication or action of the corporation. There is no showing whatsoever that any objectionable matter ever appeared in any of the magazines. The mere apprehension that this policy might be altered can furnish no firm ground to proceed against the corporation and its publications.

The applicability of the two state statutes creating the council and granting war emergency powers to the Governor has been discussed above and the latter statute eliminated. It has also been said above that the former statute gave no such powers to the council as its members exercised against complainant. While the action of the members was official in form and intent, it is long-established law that an official who acts outside of his legal powers is,. as to such acts, a private individual, who has that far placed himself beyond the protection of his official status.

[4] It therefore becomes essential to determine wherein, if at all, appellants acted beyond their official status, and the legal character and effect of such acts. This discussion will involve all of the remaining issues in the case. The record establishes that W. R. Hearst owned or controlled the policy of various large newspapers, located in several of the principal cities in the United States, and that he owned a large majority of the corporate stock of complainant company, which was engaged exclusively in publishing and selling certain magazines. The nearest of these newspapers were published in Los Angeles and San Francisco. Because it required about 36 hours for such papers to reach New Mexico, and because metropolitan papers from Denver and El Paso were much nearer, the Hearst newspapers had but a limited circulation in New Mexico. The magazines of the complainant had a large circulation in the state. The State Council of Defense became convinced that Hearst was un-American, anti-British, and pro-German in his sympathies, and that he was promoting an active propaganda of that character in his newspapers. The magazines were free from this unpatriotic matter. Moved by the conviction that the circulation in New Mexico of these newspapers and magazines would exert a dangerous influence upon the people of the state during the war, would tend to give aid and comfort to the enemy, "would tend to strengthen and upbuild the projects and institutions of the said William R. Hearst as a publisher," and that the "handling, purchase, sale, and reading of the magazines of the plaintiff, as well as all other Hearst publications, would contribute directly to the upbuilding and the success of the said William R. Hearst in his campaign of spreading pro-German and anti-Ally propaganda throughout the United States," the members of the council acted.

This action began August 7, 1917, with editorial warnings in the War News declaring, according to the affidavit of defendant Guthrie Smith, "that Hearst publications were shrieking through big headlines that it was a crime to send American troops to Europe to be slaughtered." Mr. Smith further says that there were subsequent references to Hearst in the War News to keep the people advised as to the un-American attitude of the Hearst publications, but that—

"It was not any part of the plan of the New Mexico State Council of Defense nor of the New Mexico War News to ask all the people of New Mexico to stop supporting the said Hearst by buying and reading Hearst publications, nor to ask the newsdealers to stop selling the Hearst publications, until Hearst's New York American of May 12, 1918, struck the prayer for victory in the war from President Wilson's Memorial Day proclamation."

He adds that—

"This deletion of the President's proclamation made it impossible for the Governor of New Mexico, or the said State Council of Defense, or for its members and employés, to believe that Hearst had any real or sincere desire to carry on a vigorous campaign for the successful prosecution of the war."

Smith was the publicity agent of the State Council, and, as such editor of the War News. Conceiving it to be his duty "to make such plans and arrangements as might be necessary to protect the people of New Mexico against the un-American poison which was being scattered broadcast by the Hearst publications" he deemed the best way to proceed was "to prevail upon the people of New Mexico to quit reading the Hearst publications." The attitude of himself and the other defendants was that it would be unintelligent to attempt to remedy the evil by attacking only such of the Hearst publications as published objectionable matter, but that all publications in which Hearst was interested should go. He says:

"Holding Hearst, Hearstism, and the Hearst publications to be anti-British, un-American, and pro-German, affiant says that affiant and the other defendants in this cause desired to strike at the root of the evil; that the root of Hearstism and the Hearst publications is Hearst himself; that to strike intelligently and effectively at the root of the evil it was necessary to stop reading and supporting every publication controlled or dominated by William Randolph Hearst; that therefore the appeal made by the said State Council of Defense and the other defendants in this cause, through the said New Mexico War News, was to the loyal, patriotic men and women of New Mexico not to continue support of Hearst, but instead to stop reading *all* of the Hearst publications for the period of the war; and to the patriotic newsdealers of the said state of New Mexico to stop selling or otherwise handling or distributing *all* Hearst publications for the period of the war."

Plans to this end were carefully considered, and from time to time discussed with two of the three members of the executive committee of the State Council, and the general secretary. The several steps proposed were laid before the Governor and approved by him, and the state Attorney General consulted "with respect to the matter of asking the people of the state of New Mexico not to read the Hearst publications, and asking the newsdealers of New Mexico not to sell or handle the said Hearst publications." The placard proposed to be used by newsdealers in announcing discontinuance of the sale of Hearst publications for the war was submitted to and approved by the Attorney General. Then followed the publication in the War News of the articles set forth in the complaint, which continued until this action was filed, and even afterwards, until shortly before the order was entered for the preliminary injunction.

Whatever may have been the derelictions of Hearst as an individual or in his newspapers, it is absolutely clear that complainant, which was engaged solely in publishing and selling magazines, had published no objectionable matter in its magazines, and it had nothing to do with the Hearst newspapers, nor any interest in them. The declared and obvious purpose was to destroy complainant's business in New Mexico. This purpose was proceeding toward success, when halted by the injunction of the court below. The various defendants were planning and acting together to effectuate the above pur-

pose. They were doing so without legal warrant or protection. Their acts amounted to a conspiracy to boycott or blacklist the magazines published by complainant. All of these publications came into the state through interstate commerce. The only purpose of shipping the magazines into New Mexico was for sale there; hence a movement which sought to prevent, and was succeeding in preventing, newsdealers, who were here the importers, from receiving, handling, and selling such magazines, directly interfered with that commerce. We think this situation within the prohibition of the Sherman Act, as shown by Lawlor v. Loewe, 235 U. S. 522, 35 Sup. Ct. 170, 59 L. Ed. 341; Eastern, etc., Lumber Association v. United States, 234 U. S. 600, 34 Sup. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788; Gompers v. Buck Stove Co., 221 U. S. 418, 31 Sup. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874; United States v. American Tobacco Co., 221 U. S. 179, 31 Sup. Ct. 632, 55 L. Ed. 663; Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815; Montague v. Lowry, 193 U. S. 38, 24 Sup. Ct. 307, 48 L. Ed. 608.

Any contention that appellants were within their constitutional rights of free speech in saying, writing, and publishing the objectionable matter, is answered by Gompers v. Buck Stove Co., supra. What has been said above renders unnecessary consideration of other grounds for relief alleged in the complaint and pressed upon this appeal.

The action of the trial court in the issuance of the temporary injunction was correct, and the judgment is affirmed.