HUNT ET AL., CO-PARTNERS TRADING AS HUNT'S MOTOR FREIGHT & FOOD PRODUCTS TRANSPORT, v. CRUMBOCH ET AL.

No. 570. Argued March 2, 1945.—Decided June 18, 1945.

*Messrs. Hirsh W. Stalberg* and *Peter P. Zion* for petitioners.

*Mr. William A. Gray,* with whom *Messrs. Francis Thomas Anderson* and *Walter Stein* were on the brief, for respondents.

MR. JUSTICE BLACK delivered the opinion of the Court.

The question here is whether an organization of laboring men violated the Sherman Act, as amended, 26 Stat. 209, 38 Stat. 730, by refusing to admit to membership petitioner's employees, and by refusing to sell their services to petitioner, thereby making it impossible for petitioner profitably to continue in business.

For about fourteen years prior to 1939, the petitioner, a business partnership engaged in motor trucking, carried freight under a contract with the Great Atlantic & Pacific Tea Co. (A & P). Eighty-five percent of the merchandise thus hauled by petitioner was interstate, from and to Philadelphia, Pennsylvania. The respondent union, composed of drivers and helpers, was affiliated with other A. F. of L. unions whose members worked at loading and hauling of freight by motor truck. In 1937, the respondent union called a strike of the truckers and haulers of A & P in Philadelphia for the purpose of enforcing a closed shop. The petitioner, refusing to unionize its business, attempted to operate during the strike. Much violence occurred. One of the union men was killed near union headquarters, and a member of the petitioner partnership was tried for the homicide and acquitted. A & P and the union entered into a closed-shop agreement, whereupon all contract haulers working for A & P, including the petitioner, were notified that their employees must join and become members of the union. All of the other contractor haulers except petitioner either joined the union or made closed-shop agreements with it. The

union, however, refused to negotiate with the petitioner, and declined to admit any of its employees to membership. Although petitioner's services had been satisfactory, A & P, at the union's instigation, cancelled its contract with petitioner in accordance with the obligations of its closed-shop agreement with the union. Later, the petitioner obtained a contract with a different company, but again at the union's instigation, and upon the consummation of a closed-shop contract by that company with the union, petitioner lost that contract and business. Because of the union's refusal to negotiate with the petitioner and to accept petitioner's employees as members, the petitioner was unable to obtain any further hauling contracts in Philadelphia. The elimination of the petitioner's service did not in any manner affect the interstate operations of A & P or other companies.

The petitioner then instituted this suit in a federal district court against respondents, the union and its representatives, praying for an injunction and asking for treble damages. Demurrers to the complaint were overruled, the case was tried, findings of fact were made, and the district court rendered a judgment for the respondents on the ground that petitioner had failed to prove a cause of action under the Anti-trust laws. 47 F. Supp. 571. The Circuit Court of Appeals affirmed, holding that the fact that respondents' actions had caused petitioner to go out of business was not such a restraint of interstate commerce as would be actionable under the Sherman and Clayton Acts. 143 F. 2d 902. We granted certiorari because of the questions involved concerning the responsibility of labor unions under the Anti-trust laws.

The "destruction" of petitioner's business resulted from the fact that the union members, acting in concert, refused to accept employment with the petitioner, and refused to admit to their association anyone who worked for petitioner. The petitioner's loss of business is therefore

analogous to the case of a manufacturer selling goods in interstate commerce who fails in business because union members refuse to work for him. Had a group of petitioner's business competitors conspired and combined to suppress petitioner's business by refusing to sell goods and services to it, such a combination would have violated the Sherman Act. *Binderup* v. *Pathe Exchange*, 263 U. S. 291, 312; *Fashion Originators' Guild* v. *Federal Trade Commission*, 312 U. S. 457. A labor union which aided and abetted such a group would have been equally guilty. *Allen Bradley Co.* v. *Local Union No. 3, ante*, p. 797. The only combination here, however, was one of workers alone and what they refused to sell petitioner was their labor.

It is not a violation of the Sherman Act for laborers in combination to refuse to work. They can sell or not sell their labor as they please, and upon such terms and conditions as they choose, without infringing the Antitrust laws. *Apex Hosiery Co.* v. *Leader*, 310 U. S. 469, 502–503. A worker is privileged under congressional enactments, acting either alone or in concert with his fellow workers, to associate or to decline to associate with other workers, to accept, refuse to accept, or to terminate a relationship of employment, and his labor is not to be treated as "a commodity or article of commerce." Clayton Act, 38 Stat. 730, 731; Norris-LaGuardia Act, 47 Stat. 70; see also *American Steel Foundries* v. *Tri-City Council*, 257 U. S. 184, 209. It was the exercise of these rights that created the situation which caused the petitioner to lose its hauling contracts and its business.

It is argued that their exercise falls within the condemnation of the Sherman Act, because the union members' refusal to accept employment was due to personal antagonism against the petitioner arising out of the killing of a union man. But Congress in the Sherman Act and the legislation which followed it manifested no purpose to make *any* kind of refusal to accept personal employment

a violation of the Anti-trust laws. Such an application of those laws would be a complete departure from their spirit and purpose. Cf. *Apex Hosiery Co. v. Leader, supra,* 512; *Allen Bradley v. Local Union No. 3, supra.* Moreover "So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit under § 20 are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means." *United States v. Hutcheson,* 312 U. S. 219, 232.[1]

It is further argued that the concerted refusal of union members to work for petitioner must be held to violate the Sherman Act because petitioner's business was "an instrumentality of interstate commerce." See *United States v. Trans-Missouri Freight Assn.,* 166 U. S. 290, 312. Acceptance of this contention would imply that workers do not possess the same privileges to choose or reject employment with interstate carriers as with other businesses. The entire history of congressional legislation, including the Railway Labor Act, 48 Stat. 1185, belies this argument.

Finally, it is faintly suggested that our decisions in *Steele v. L. & N. R. Co.,* 323 U. S. 192; *Tunstall v. Brother-*

---

[1] *Dorchy v. Kansas,* 272 U. S. 306, 311, cited here in dissent, has no relevancy to the issues before us. In that case Dorchy was convicted of calling a strike to enforce a stale claim contrary to state law. He attacked the state law on the ground that the right to strike was guaranteed by the Fourteenth Amendment. This Court rejected Dorchy's constitutional contention with the statement that "Neither the common law, nor the Fourteenth Amendment, confers the absolute right to strike." The Court had no reason in the *Dorchy* case to consider the Clayton Act, which as we decided in the *Hutcheson* case does recognize an absolute right of employees to work or cease working according to their own judgments. That which Congress has recognized as lawful, this Court has no constitutional power to declare unlawful, by arguing that Congress has accorded too much power to labor organizations.

*hood,* 323 U. S. 210, and *Wallace Corp.* v. *Labor Board,* 323 U. S. 248, require that we hold that respondents' conduct violated the Sherman Act. Those cases stand for the principle that a bargaining agent owes a duty not to discriminate unfairly against any of the group it purports to represent. But if the record showed discrimination against employees here, it would not even tend to show a violation of the Sherman Act. Congress has indicated no purpose to make a union's breach of duty to employees in a collective bargaining group an infraction of the Sherman Act.

The controversy in the instant case, between a union and an employer, involves nothing more than a dispute over employment, and the withholding of labor services. It cannot therefore be said to violate the Sherman Act, as amended. That Act does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce. "The maintenance in our federal system of a proper distribution between state and national governments of police authority and of remedies private and public for public wrongs is of far-reaching importance. An intention to disturb the balance is not lightly to be imputed to Congress." *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, 513. Whether the respondents' conduct amounts to an actionable wrong subjecting them to liability for damages under Pennsylvania law is not our concern.

*Affirmed.*

MR. JUSTICE ROBERTS.

I think the judgment should be reversed.

The issue presented in this case, in my judgment, lies wholly outside and beyond any precedent to be found in the decisions of this court, and certainly so as to *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, on which the court relies.

There was a labor dispute as to unionization between motor carriers and the union representing employes. The record demonstrates that the dispute involved in this case was no part of that labor dispute but an off-shoot of it; not involving wages, unionization, closed shop, hours or other conditions of work.

The union, in an effort to organize the employes of motor carriers, resorted to a strike. The petitioners resisted unionization. During the ensuing disorder a man was shot. The union officials attributed the killing to one of the petitioners. In fact he was acquitted by a jury. The respondents decided to punish him. The respondents having succeeded in unionizing the industry in Philadelphia the petitioners could continue in their business of interstate carriage only by having their men join the union and by signing a closed-shop contract. The union determined to punish petitioners by refusing to sign a contract with them and by forbidding the members of the union to work for them. There is no suggestion in the record that they did so because of any labor conditions or considerations, or that petitioners' men would not join the union, or that union men would not work with them, if they did join. It is hardly an accurate description of their attitude to say that the union men decided not to sell their labor to the petitioners. They intended to drive petitioners out of business as interstate motor carriers, and they succeeded in so doing.

The petitioners, for fourteen years, had been carriers of merchandise in interstate commerce. The union compelled A. & P., their principal patron, to break its contract with them and to discharge them from further serving it. The union frustrated efforts of petitioners to obtain contracts with other shippers.

The petitioners had been, and were at the time, in competition with other similar interstate carriers. The sole purpose of the respondents was to drive petitioners out of

business in that field. This they accomplished. Thus they reduced competition between interstate carriers by eliminating one competitor from the field. The conspiracy, therefore, was clearly within the denunciation of the Sherman Act, as one intended, and effective, to lessen competition in commerce, and not within any immunity conferred by the Clayton Act.

The CHIEF JUSTICE, MR. JUSTICE FRANKFURTER and MR. JUSTICE JACKSON join in this opinion.

MR. JUSTICE JACKSON, dissenting.

The Court concedes that if business competitors alone or in combination with labor had conspired to drive petitioners out of business by refusing goods or services, competitors and labor organization would have violated the Sherman Act. The only question then is whether respondent is exempted from the prohibition of the Act. It is hard to see how this union is excused from the terms of the Act when in the *Allen Bradley* case we hold that labor unions even though furthering their members' interests as wage earners violate the Act when they combine with business to do the things prohibited by the Act. There, too, labor performed its part of the conspiracy by denying or threatening to deny labor to employers. But in that case we hold that no absolute immunity is granted by the statute, and that because of its purpose and its association, the labor union violated the Act. Here too the purpose of the respondent union is such as to remove the union's activities from the protection of the Clayton and Norris-LaGuardia Acts.

We say in the *Allen Bradley* case that, since a labor dispute existed, the refusal of the union to work would not have violated the Sherman Act if it had acted alone. In that case, the Court reviews fully the *conflicting* policies expressed in those Acts intended to preserve competition

and in those which permit labor organizations to pursue their objectives. Those statutes which restricted the application of the Sherman Act against unions were intended only to shield the legitimate objectives of such organizations, not to give them a sword to use with unlimited immunity. The social interest in allowing workers to better their condition by their combined bargaining power was thought to outweigh the otherwise undesirable restriction on competition which all successful union activity necessarily entails. But there is no social interest served by union activities which are directed not to the advantage of union members but merely to capricious and retaliatory misuse of the power which unions have simply to impose their will on an employer.

The *Apex* case is authority only for the principle that a labor organization which employs its power for recognized purposes does not violate the Sherman Act, unless its purpose is to affect and it does affect competition in the marketing of goods and services. That case says nothing of the direct destruction of competition in interstate commerce, as an end in itself, which the respondent union here effectuated. It explicitly declares that to some extent labor unions are subject to the Sherman Act. *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, 489. Much of what we said in *American Medical Assn.* v. *United States,* 317 U. S. 519, is applicable here, although that case did not involve a labor union: "The petitioners did not represent present or prospective employes. Their purpose was to prevent anyone from taking employment under Group Health. They were interested in the terms and conditions of the employment only in the sense that they desired wholly to prevent Group Health from functioning by having any employes. Their objection was to its method of doing business. Obviously there was no dispute between Group Health and the doctors it employed or might employ in which petitioners were either directly or indi-

rectly interested." And in that case, we held the Clayton and Norris-LaGuardia Acts inapplicable and sustained convictions under the Sherman Act. It can hardly be said that merely because respondent is a labor union, for that reason alone a labor dispute is involved in the present case.

Respondents contend that, in any event, their conduct is not prohibited by the Sherman Act because prices within the field were not affected and the public did not suffer. *Appalachian Coals* v. *United States,* 288 U. S. 344, and similar cases refusing to apply the Sherman Act held that certain practices were permissible because they did not restrain competition in the industry as a whole, although they did restrain competition among the parties to the agreement. But there is a difference between being a party to consensual restriction of competition within a segment of an industry and being forced out of the industry entirely. Competition within the field has been lessened by the elimination of one of the companies engaged therein. Of course it cannot be said on this record that the destruction of petitioner's business substantially affected market conditions in the services which petitioner was engaged in rendering. Cf. *Apex Hosiery Co.* v. *Leader, supra,* at 512. But, even assuming that such an effect is necessary, the Court does not distinguish between the situation presented in this case and a case in which a union by similar methods and with similar motives would drive out of business a company whose demise would affect prices in the field.

With this decision, the labor movement has come full circle. The working man has struggled long, the fight has been filled with hatred, and conflict has been dangerous, but now workers may not be deprived of their livelihood merely because their employers oppose and they favor unions. Labor has won other rights as well, unemployment compensation, old-age benefits and, what is

most important and the basis of all its gains, the recognition that the opportunity to earn his support is not alone the concern of the individual but is the problem which all organized societies must contend with and conquer if they are to survive. This Court now sustains the claim of a union to the right to deny participation in the economic world to an employer simply because the union dislikes him. This Court permits to employees the same arbitrary dominance over the economic sphere which they control that labor so long, so bitterly and so rightly asserted should belong to no man.

Strikes aimed at compelling the employer to yield to union demands are not within the Sherman Act. Here the employer has yielded, and the union has achieved the end to which all legitimate union pressure is directed and limited. The union cannot consistently with the Sherman Act refuse to enjoy the fruits of its victory and deny peace terms to an employer who has unconditionally surrendered.

Mr. Justice Brandeis, for a unanimous Court, held that a union cannot lawfully strike for an unlawful purpose. "The right to carry on business—be it called liberty or property—has value. To interfere with this right without just cause is unlawful. The fact that the injury was inflicted by a strike is sometimes a justification. But a strike may be illegal because of its purpose, however orderly the manner in which it is conducted. To collect a stale claim due to a fellow member of the union who was formerly employed in the business is not a permissible purpose." *Dorchy* v. *Kansas*, 272 U. S. 306, 311. No more permissible is an exaction of privately-determined punishment for alleged murder. And being unlawful, union activities of this kind are not protected by the Clayton and Norris-LaGuardia Acts.

The CHIEF JUSTICE and MR. JUSTICE FRANKFURTER join in this opinion.